Nott, Ch. J.,
delivered the opinion of the court:
The recent elaborate arguments in this court, in this and other cases, on the interpretation to be given to the term “the seat of war” in the Bowman Act, has raised no point and presented no question which was not presented and considered eleven years ago, when the cases of Hefelbower and Neal (21 C. Cls. R., pp. 228-240) were before the court.
Those cases, moreover, were decided after the court had heard a number of counsel interested in other cases upon that question, and the subject was carefully considered, and the court reached its final conclusion after unusual deliberation. The decisions were then certified to Congress, where the question involved was again the subject of consideration both in committees and in each of the Houses of Congress. By Congress the conclusions of the court were deliberately, and with *448 substantial unanimity, affirmed. The construction given to the statute in those cases did not determine any legal right j. it related merely to the jurisdiction of the comt; and the decisions left Congress absolutely free to grant or refuse relief as might seem best in the exercise of the legislative discretion. Nevertheless, Congress, in the exercise of that discretion, proceeded to give relief in this class of cases, and in no instance during these eleven years has it been withheld. The court, therefore, does not feel at liberty to reopen the question; for, in the first place, it would be an overthrow of the restful principle of stare decisis, which should govern courts; and, in the second place, if the court should refuse to hear such cases now, it Avould be an interference with an established legislative policy, as declared in repeated instances and by successive Congresses.
Two questions, however, are before the court, which were not determined in the cases of Hefelbower and Neal, and those we will now consider.
This term, “the seat of war,” at first seems simplicity itself. But the moment we pass to the practical application of it — to the varied military and political conditions of thecountryduring the civil war — the novel term becomes one of many perplexities. ■Moreover, it is coupled with another ambiguous term, “the operations ” of the military forces. The language of the statute imports that the jurisdiction of the court shall not extend to two classes of claims; to claims “growing out of the destruction or damage to property by the Army or Navy during the war for the suppression of the rebellion,” to claims “for the use and occupation of real estate by any part of the military or naval forces of the United States in the operations of said forces during the said war at the seat of war.” What were “the operations” intended? When a surgeon procured a commodious and well-ventilated building as a hospital for the sick, was that an “operation” by a “part of the military forces of the United States” within the intent of the statute? When a commissary procured a well-watered farm as a grazing ground for a herd of cattle which he had bought, was that an “operation” by a part of the military forces? And, with this term “ the operations” of the military forces so uncertain and undefined, what does the other term “the seat of war7? mean? It .can not mean the scene of the actual conflict of armies, the. *449 place where a battle was fought, or where the occupation of the military forces was an inevitable incident to military movements, for that was provided for by the other provision — the one withholding jurisdiction of claims “growing out of the destruction or damage to property by the Army or' Navy.” It can not mean the ordinary occupation of property for governmental purposes, for its immediate context restricts the restriction to cases where the use and occupation was that of the military or naval forces “ in the operation of said forces.” It can not mean the whole territory of the seceded States, for every statute and proclamation had designated them as “ States in insurrection;” and it was manifest on the face of the Bowman Act that it did contemplate a use and occupation of real property as a subject of jurisdiction within the insurrectionary States, and even within the seat of war, provided the use and occupancy were not by the military and naval forces “in the operations of said forces.” In a word, it is manifest that the “seat of war” was something less than the territory of the seceded States.
When we turn to the military and political history of the civil Avar, the reason for the use of this restricted term of the statute becomes apparent. From the first there were parts of the seceded States which were never declared to be in insurrection. At different times and in various ways the exceptional character of these parts of the country was recognized, sometimes by the Executive, sometimes by Congress, sometimes by both. (See Hefelbower Case (supra), where the statutes and proclamations and the action of the Executive and Congress are set forth.) The recognition varied, and the political character of the excepted territory was so mingled with the changing circumstances of the war that it can not be uniformly defined; but the manifest purpose of both the Executive and Congress was to relieve the unfortunate inhabitants of the excepted districts, so far as that could be done consistently with a vigorous prosecution of the war, from the sufferings and penalties and forfeitures of war.
First of these excepted parts of the insurrectionary States were the thirty-nine counties which subsequently became, with some others, the State of West Virginia; next in importance, if not in time, was the State of Tennessee. Both were placed *450 by Congress, in the matter of private property taken for military use, in the class of States which had never been in insurrection — that is to say, the citizens of both might present their claims to the Quartermaster-General for jiayment under the provisions of the Act 4th July, 1864 (13 Stat. L., 381), precisely as the citizens might do of those States which had never been declared in insurrection.
For the reasons given in the Hefelbower Case the court deemed the question as to what was and what was not the seat of war a matter which must have been determined by the President, and not an issue to be tried in every case and determined by the judiciary. The reason why the court took the Emancipation Proclamation as decisive was because that proclamation was confessedly a military measure — au exercise of the war power. Moreover, it was an exercise of the war power directed against private property. By it the President in effect declared that the war was still flagrant in the insurrec-tionary States, with the exception of Tennessee and parts of Virginia and Louisiana. In the excepted States and parts of States the war existed as it did in Pennsylvania and Maryland and Ohio, but it did not exist to the extent of requiring a forfeiture of private property pursuant to the terms of the prior proclamation, September 22,1862. Battles might be fought in Tennessee as in Pennsylvania, and troops might be needed to protect New Orleans as they were needed to protect the city of Washington, but the seat of war, so far as it affected private property, had receded to the insurrectionary States and parts of States on which the war measure of the Emancipation Proclamation fell.
Out of abundant caution the court has desired arguments on the effect, if any, of the proclamation of April 2,1863 (13 Stat. L., 730), in which the President declares no exception in favor of Tennessee or in favor of the parishes in Louisiana, but revokes the exceptions in a former proclamation (the first under the nonintercourse act) and declares that the inhabitants of the States of Tennessee, Louisiana, Virginia, and the others, except the 48 counties of Virginia designated as West Virginia, and the ports of New Orleans, Key West, Port Boyal and Beaufort, N. C., are in a state of insurrection, and that all commercial intercourse, unless licensed and conducted as provided in said act, shall be unlawful. The court is of the opinion that this proclamation did not affect the military status of *451 any part of tbe country and that it was not intended to, but that it was simply a modification and extension of the previous proclamation regulating trade and commercial intercourse between the North and South. The strictly commercial character of this proclamation seems to be unquestionable when the fact is noted that it allows unrestricted commercial intercourse with “ the ports ” of Key West, Port Boyal, and Beaufort. They were situated in States which had been declared in insurrection, and they had not been excepted from the operation of the Emancipation Proclamation; but they were marts of commerce with which unrestricted trade and intercourse might be allowed, though their legal status was that of enemy’s territory held by military force.
Though no formal decision set forth in an opinion of the court has been made relative to other territory than that of the State of Tennessee, there have been a number of cases acted upon and reported to Congress, in all of which the seat of war has been treated as hereinbefore indicated and in all of which Congress has acted affirmatively and favorably upon the reported cases. We therefore regard the question as having been settled as conclusively by legislative action as if the excepted parts of Virginia and Louisiana had been the subject of an express decision in the reported cases.
The petition of the claimant in this case sets up in effect two causes of action — one for the use and occupation of the premises 11 from September 1,1864, to May 27,1865, as a storehouse the other, for its destruction “by fire.” The petition also 'alleges that “the troops occupying and destroying said property were those under General Weitzel.” If the destruction by fire was accidental, the court is aware of no rule of law in Louisiana which would hold the tenant responsible for the loss in the absence of an express covenant to restore the same; if the destruction was by the troops, as the allegation quoted states it to have been, the court is inhibited from exercising jurisdiction by the express terms of the Bowman Act.
The order of the court is that the motion of the defendants to dismiss for want of jurisdiction be overruled.